1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Willie D. JOHNSON,<br><br>                    Petitioner,<br><br>          v.<br><br>Kevin CHAPPELLE,<br>Acting Warden of San Quentin State Prison,[1]<br><br>                    Respondent. | Case Number 3-98-cv-4043-SI<br><br>DEATH-PENALTY CASE<br><br>ORDER REGARDING § 2254(d)(1)<br><br>[Doc. No. 296] |

        In this capital habeas action, the Court previously granted Petitioner Willie D. Johnson an evidentiary hearing as to five claims in his Petition, all of which had been denied on the merits by the Supreme Court of California.   The Court has stayed the evidentiary hearing pending a determination of the effect of *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011), on these proceedings.  In *Pinholster*, the Supreme Court of the United States held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398.  In the present Order, the Court reviews the five claims

---

        [1] Kevin Chappelle is automatically substituted for his predecessor as the named Respondent pursuant to Federal Rule of Civil Procedure 25(d).

at issue under § 2254(d)(1) based on the record that was before the Supreme Court of California when it denied the claims.[2]

## I.   PROCEDURAL BACKGROUND - STATE COURT

Petitioner was tried in the Superior Court of California for the County of Contra Costa.  The evidence at trial showed that on July 1, 1986, Angela Womble[3] lived with her mother, Willie Lee Womble, and her sixteen-month-old son, Terrance (nicknamed Tee Tee), on South 42nd Street in Richmond, County of Contra Costa, California.  Tee Tee's father, Terrance Henderson (nicknamed Tee), was Angela's former boyfriend and a drug dealer.  While still Tee's girlfriend, Angela held money for Tee that was obtained through robberies and drug sales; she claimed that she stopped doing so when their relationship ended in August 1984, although evidence suggests otherwise.

Angela cashed a payroll check on July 1, 1986.  At home that evening, she put cash in envelopes in the kitchen to pay bills.

Angela heard a knock at the front door at around 9:45 or 10:00 p.m.  She asked who was there and heard a man answer, "Ann, this is Allie.  Come take me to the gas station."  She recognized the voice as that of John Allen Duchine, a friend of Tee's, and she opened the door.  On her front porch were Duchine and another man whom she did not know; both were carrying guns. The two forced their way into the house, knocking Angela to the floor.

Angela sat on the floor, looking at the men, for one or two minutes.  At trial, she testified that lights were on in the breakfast nook and the bathroom; she could not remember whether the kitchen and living room were illuminated; the porch light was off.  There was a street light to the north of the Womble residence.  Angela testified that Duchine's companion was wearing a white T-shirt and jacket and a shiny stud earring and was carrying a shotgun around twenty inches in length with a barrel about the size of a half-dollar coin.

---

[2] This Order terminates Document No. 296.

[3] For the sake of clarity, the Court generally refers to Angela Womble and certain other individuals by their first names or nicknames.

Willie Womble ran to the living room and began to hit Duchine's companion, trying to force him to let go of his gun and demanding that he leave her house. Duchine's companion pushed Willie Womble to the ground with his gun. Angela told her mother to stop and sit down.

Duchine demanded that Angela give him money. She got up and retrieved the money from the bill-payment envelopes, giving it to Duchine; she then returned to the living room and sat down. Duchine ordered her to give him all the money. Angela said she had given him all she had, but he demanded, "Where's Tee's money?" Angela said that she did not have Tee's money. Duchine accused her of lying and again asked where the money was.

Angela, carrying Tee Tee, and Duchine went to Angela's mother's bedroom. Duchine rummaged through the room, looking for money. Eventually Angela and Duchine returned to the living room. Duchine and his companion spoke with each other, but Angela could not hear what they said.

Duchine's companion pumped his shotgun and fired it into the ceiling. Angela urged her mother to lie down. Duchine's companion again fired into the ceiling, then pointed the weapon down and fired into the back of Willie Womble's head. Duchine and his companion then pointed their weapons at Angela, who also had lain down on the floor. She tried to duck, but felt she had been shot. Ten or fifteen seconds later, Duchine and his companion left the house, closing the front door behind them.

Angela crawled to the front door but could not open it. Tee Tee pulled the door open for her and she screamed for help. Several neighbors responded. Angela told one of her neighbors that she had been shot by Duchine and another man. A police officer arrived and asked Angela who had shot her. She named Duchine and described him; she said that she did not know the other man, but gave a brief description of him.

Various neighbors testified regarding their observations on the night of the crimes; one neighbor, Willa Mae Addison,[4] heard firecracker sounds, then, from her second-floor window, saw two men depart the Womble residence, run along the side of the house into an alley, and get into a

---

[4]  This witness is sometimes referred to by the parties as "Willie Mae Addison."

white or cream-colored pickup truck and drive away.  Evidence was presented that Petitioner's mother, Valine Duckett, owned a two-tone, tan-over-brown pickup truck.  Police officers who responded to the call testified that they were able to see in the lighting conditions present in the Womble residence.

Other testimony showed that Duchine and Petitioner were together on the day of the crimes and after the crimes participated together in a telephone call.  Ketcia Hawkins, a friend of Angela's who was acquainted with Petitioner and Duchine, testified that she saw the two men between 5:00 and 6:00 p.m. in the Easter Hill neighborhood of Richmond.  Later that night, Hawkins received a telephone call from a relative of Angela's who told her about the crime.  Between 10:30 and 11:00 p.m., Hawkins in turn called Zina Sims, Petitioner's cousin.  Hawkins testified that while Hawkins remained on the line Sims dialed another party, using three-way calling.  Hawkins recognized the third party's voice as that of Renee Morgan, Petitioner's sister.  After Hawkins spoke with Morgan, Duchine came on the line.  While Duchine was on the line, Petitioner also came on the line.

Sims testified that she received a telephone call from Hawkins between 10:00 and 10:30 p.m., but denied placing any calls while Hawkins was on the line.  Nonetheless, she testified that, after talking with Hawkins, she called Duckett's house and spoke briefly with Morgan.  Later, Morgan telephoned Sims.  Both Petitioner and Duchine spoke with Sims during the latter call.

The day after the offense, Richmond Detective Michael Shipp interviewed Angela at the hospital where she was receiving treatment.  She had difficulty breathing and was connected to an oxygen machine.  Shipp showed her two photographic lineups, each consisting of six photographs.  In the first lineup, Angela positively identified Duchine's photograph.  In the second, Angela identified Petitioner's photograph, saying that she was not positive but that he looked like the man who shot her mother.  She gave a verbal description of the gunman and said that friends and relatives had told her that Duchine's accomplice was "Willie Johnson."

In a July 7 telephone interview, Angela again described the man in a fashion generally consistent with her earlier descriptions.  She specified that he wore an earring in his right ear.

On July 18, having learned the previous day that Petitioner was in custody in Martinez, Det. Shipp attempted to arrange for Angela to view a live lineup.  Petitioner refused to participate despite

1 being told that he did not have a right to refuse and that the refusal could be used against him in

2 court.

3       Det. Shipp showed Angela another photographic lineup on July 22.  The lineup included a

4 picture of Petitioner that was taken more recently than the one shown Angela on July 2.  This time,

5 Angela positively identified Petitioner's photograph.

6       No physical evidence linked Petitioner to the crime.

7       The defense was misidentification.  Dr. Elizabeth Loftus, a professor of psychology, testified

8 about factors affecting human perception, memory, and identification.  She testified that there are

9 three stages of memory:  acquisition, retention, and retrieval.  An evaluation of a witness's

10 acquisition of a visual memory must consider lighting conditions, distance of the witness from the

11 object seen, and the witness's level of stress or fright.  Under high levels of stress or fright, she

12 testified, the ability to perceive and remember may be significantly impaired.

13       Dr. Loftus described a phenomenon known as "weapon focus":  when a crime involving a

14 weapon occurs, the weapon's presence can capture a great deal of the witness's attention, which can

15 lead to reduced ability to remember and to describe accurately other details.  Dr. Loftus also stated

16 that there is a tendency for a witness to overestimate the duration of relatively short events,

17 especially complex ones, and that women tend to overestimate more than men.

18       Dr. Loftus testified that, when it comes to the retention of memory, the longer the interval

19 of time that passes before the witness tries to recall information from memory, the less accurate the

20 memory is.  Moreover, what occurs in the retention interval is crucial:  if the witness is exposed to

21 new, suggestive, or confirming information about the event, the greater is the potential for

22 contamination of the witness's memory.  Dr. Loftus also stated that studies have demonstrated that

23 there is little or no correlation between the witness's confidence in his or her memory and its

24 accuracy.

25       The jury convicted Petitioner of the murder of Willie Womble, *see* Cal. Penal Code § 187

26 (West 1986); the attempted murder of Angela Womble, *see id.*; *id.* § 664; robbery in an inhabited

27 dwelling, *see id.* § 213.5; and first-degree burglary, *see id.* §§ 459-60.  The jury found "special

28 circumstances" of robbery and burglary felony-murder.  *Id.* § 190.2.  The jury also found that

1   Petitioner used a firearm in the commission of these offenses, *see id.* § 12022.5, and inflicted great

2   bodily injury in the commission of the attempted murder, the robbery, and the burglary, *see id.* §

3   12022.7.  Following the penalty phase of his trial, the jury sentenced Petitioner to death.

4          On direct appeal, the Supreme Court of California affirmed the judgment in its entirety.

5   *People v. Johnson*, 842 P.2d 1 (Cal. 1992).  In connection with Petitioner's state petition for a writ

6   of habeas corpus, that court determined that disputed facts necessitated an evidentiary hearing

7   regarding Petitioner's claim of innocence.  The court appointed a referee with directions to take

8   evidence and make findings of fact on the following question:  "Is petitioner innocent of the murder

9   of Willie Womble, in that his deceased brother, Timothy Johnson, committed the crime?"  After

10  hearing the evidence, the referee found that Petitioner had not met his burden of establishing his

11  innocence; the referee also made findings related to the credibility of the witnesses who testified

12  before him.  The state supreme court issued an opinion in which it concluded that the referee's

13  findings were supported by substantial evidence, and the court therefore denied the habeas petition.

14  *In re Johnson*, 957 P.2d 299 (Cal. 1998).  The state court summarily denied Petitioner's other habeas

15  claims.  *See id.* at 306.

16

17  **II.     PROCEDURAL BACKGROUND - FEDERAL COURT**

18         This Court granted an evidentiary hearing on five claims in Petitioner's federal habeas

19  petition:  Claim A—false and perjured evidence that was substantially material or probative on the

20  issues of guilt, innocence, and punishment was introduced at Petitioner's trial; Claim H—Petitioner

21  was denied the effective assistance of counsel during the guilt phase of his trial; Claim I—Petitioner

22  is innocent; Claim P—Petitioner was denied the effective assistance of counsel during the penalty

23  phase of his trial; and a portion of Claim Q—juror misconduct violated Petitioner's rights in that the

24  jury was exposed to and discussed unreliable extra-record statements during deliberations.  The

25  Supreme Court of California denied all five of these claims on the merits.  Thus, this Court "shall

26  not" grant the Petition as to any one of these claims

27                     unless the [state-court] adjudication of the claim—(1) resulted in a
                       decision that was contrary to, or involved an unreasonable application
28                     of, clearly established Federal law, as determined by the Supreme

Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (2012). *Pinholster* held that "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. at 1398.

As noted, with the exception of Claim I, the Supreme Court of California denied Petitioner's claims summarily. "Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that the claims made in the petition do not state a prima facie case entitling the petitioner to relief." *Id.* at 1402 n.12 (internal quotation marks, brackets, and citation omitted); *In re Johnson*, 957 P.2d at 306 ("by limiting our order to show cause to the question of Timothy Johnson's culpability, we impliedly found petitioner had not established a prima facie case as to the [other] issues"). Accordingly, this Court is presently called upon to "determine what arguments or theories . . . could have supported," *Harrington v. Richter*, 562 U.S. ____, 131 S. Ct. 770, 786 (2011), the state court's decision that Petitioner failed to state a prima facie case for relief for Claims A, H, P, and Q, and then to "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of" the Supreme Court of the United States, *id.* As to Claim I, this Court must determine whether it was unreasonable for the Supreme Court of California to decide that Petitioner did not prove his innocence at the evidentiary hearing that was held on the issue.

## III.   EVALUATION OF CLAIMS

### A.   Claims A and H – False Evidence and Ineffective Assistance of Trial Counsel at Guilt Phase

Claims A and H largely overlap. These claims are therefore discussed together.

In Claim A, Petitioner asserts that false and perjured evidence that was substantially material or probative on the issues of guilt, innocence, and punishment was introduced at his trial. To establish this claim, Petitioner must prove that: (1) the evidence in question was false or perjured; (2) the prosecutor knew or should have known that the evidence was false or perjured; and (3) there is a reasonable likelihood that the false or perjured evidence affected the jury's decision. *See United*

1   *States v. Agurs*, 427 U.S. 97, 103 (1976).   The evidence need not be outright false if, taken as a

2   whole, it gave the jury a false impression.  *See Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

3        In Claim H, Petitioner asserts that he was denied the effective assistance of counsel during

4   the guilt phase of his trial.  "The right to the effective assistance of counsel at trial is a bedrock

5   principle in our justice system."  *Martinez v. Ryan*, 566 U.S. ____, No. 10-1001, slip op. at 9 (Mar.

6   20, 2012).  To obtain relief on this claim, Petitioner must satisfy the test set forth in *Strickland v.*

7   *Washington*, 466 U.S. 668 (1984); *see, e.g.*, *Missouri v. Frye*, 566 U.S. ____, No. 10-444 (Mar. 21,

8   2012); *Lafler v. Cooper*, 566 U.S. ____, No. 10-209 (Mar. 21, 2012).  "Ineffective assistance under

9   *Strickland* is deficient performance by counsel resulting in prejudice, with performance measured

10  against an objective standard of reasonableness under prevailing professional norms."  *Rompilla v.*

11  *Beard*, 545 U.S. 374, 380 (2005) (internal citations and quotation marks omitted).   Counsel's

12  performance must be assessed "from counsel's perspective at the time," so as "to eliminate the

13  distorting effects of hindsight."  *Strickland*, 466 U.S. at 689.  There is "a strong presumption that

14  counsel's conduct falls within the wide range of reasonable professional assistance"; hence

15  "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Id.*  Further, with respect

16  to the issue of investigative strategy,

17          Strategic choices made after less than complete investigation are

18          reasonable precisely to the extent that reasonable professional
    judgments support the limitations on investigation.  In other words,

19          counsel has a duty to make reasonable investigations or to make a
    reasonable decision that makes particular investigations unnecessary.

20          In any ineffectiveness case, a particular decision not to investigate
    must be directly assessed for reasonableness in all the circumstances,

21          applying a heavy measure of deference to counsel's judgments.

22  *Id.* at 690–91.  A deficient performance prejudices a defense if "there is a reasonable probability

23  that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

24  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*

25  at 694.  *Strickland* thus "requires showing that counsel's errors were so serious as to deprive

26  [Petitioner] of a fair trial, a trial whose result is reliable."  *Id.* at 687.

27

28

**1.    Angela Womble/Det. Shipp interview tape - reference to Willie Johnson**

Detective Michael Shipp interviewed Angela at the hospital on the day after the offense. The interview was audiotaped; this tape was edited so that only parts of it were played for Petitioner's jury. According to a transcript of the full interview, Angela was the first to mention Petitioner's name, in a portion of the interview that was not played for the jury:

> MS. WOMBLE: The young man, the other one I identified—
>
> DET. SHIPP: Uh-huh.
>
> MS. WOMBLE: —was that Willie Johnson?
>
> DET. SHIPP: I'll—I'll—I'll tell you after—I'll talk to you about that—
>
> MS. WOMBLE: Because several family members—
>
> DET. SHIPP: What makes you think his name is—
>
> MS. WOMBLE: and friends—
>
> DET. SHIPP: Willie Johnson?
>
> MS. WOMBLE: —said that that was Willie Johnson.
>
> DET. SHIPP: How would they know?
>
> MS. WOMBLE: I—I guess—you know, everybody in Richmond practically grew up together; we either all went to school together or we all hung out together.
>
> DET. SHIPP: Are we talking about Timothy Johnson's brother?
>
> MS. WOMBLE: Yes.

Both Angela and Shipp mentioned Petitioner's name a number of other times during the interview. For example, in portions of the tape not played for the jury, Shipp asked, "Did Terrance use this guy named Willie Johnson's truck, his mother's truck for anything?"; Shipp stated, "this guy you're talking about, Johnson—Willie Johnson deals drugs"; and Shipp inquired, "Did you know Willie Johnson?"

Toward the end of the interview, in a portion of the tape that was played for the jury, Angela and Shipp had the following exchange.

> MS. WOMBLE: Willie was there standing over my mama,

like I told you, with a gun, like you hold them in the service.

DET. SHIPP:  Now, you're saying 'Willie.'  I haven't said his name, but the person. . . .

MS. WOMBLE:  I—I was told that—who Allie was hanging with—

DET. SHIPP:  But you've never—

MS. WOMBLE:  —was Willie Johnson.

DET. SHIPP:  The person that you identified, if that was Willie Johnson, you've never seen him before, so you—

MS. WOMBLE:  No, sir.

DET. SHIPP:  You picked out the photograph on your own and not from what someone told you.

MS. WOMBLE:  I have never seen him before.

Petitioner contends that Shipp's statement that he had not said Petitioner's name was false, and it misled the jury into believing that Shipp had not suggestively said Petitioner's name earlier in the interview and that Angela independently identified Petitioner by name.  Petitioner further contends that trial counsel rendered ineffective assistance by permitting Shipp's earlier mentions of Petitioner's name to be edited out of the tape that was played for the jury.

Taken alone and out of context, the statement at issue would be inaccurate.  However, Angela did say Petitioner's name before Shipp did, and it was Shipp who had Angela clarify that she did not know Petitioner and could not independently identify Petitioner by name.  Moreover, Petitioner might have been prejudiced if the edited portions of the tape had been played for the jury, as they provided a basis for Angela's references to Petitioner's name.  Accordingly, the Supreme Court of California reasonably could have found that there was no reasonable likelihood that the statement at issue had any effect on the jury's decision, and that the statement did not prejudice Petitioner.[5]

---

[5] The audiotape that the jury heard included (1) Angela's speculations that Duchine, and perhaps his companion, arrived at the Womble residence intending not just to rob, but to kill her; and (2) Angela's concern that she might still be in the hospital during her mother's funeral.  Petitioner argues that his counsel rendered ineffective assistance by not having these statements edited from the tape.  However, the Supreme Court of California reasonably could have concluded that these statements were not prejudicial as they were not relevant to Angela's identification of Petitioner.

### 2.     Angela Womble/Det. Shipp interview tape - reference to earring

During that first interview, Angela tentatively identified Petitioner from a photographic lineup.  In accordance with his supplemental police report from six days later, Det. Shipp testified that Angela said during the interview that "the only thing I need to see is an earring."  Petitioner claims that Angela actually said that the "thing I really could see was the earring."  Petitioner argues that Shipp testified falsely to mislead the jury into concluding that Angela's identification of Petitioner was firm, not tentative, and that trial counsel was ineffective in connection with this testimony.  Petitioner further argues that an audio expert would have informed trial counsel of what Angela actually said, but there is no statement to that effect from an expert in the state-court record.

The jury heard the portion of the audiotape that contained the statement in question, and it was therefore in a position to determine what Angela actually said.  Accordingly, the Supreme Court of California reasonably could have found based on the record before it that Shipp's testimony as to what Angela said likely had no effect on the jury and was not prejudicial.

### 3.     Scope of contacts between Det. Shipp and Angela Womble

Petitioner alleges that Det. Shipp testified falsely that he tape-recorded all of his conversations with Angela prior to December 16, 1986, thereby giving false evidence or withholding evidence of additional discussions that he had with Angela about the case.  Petitioner further claims that trial counsel unreasonably failed to discover that Shipp's testimony was false.  However, there is nothing in the record to indicate what Angela might have said that was significant in any additional discussions.  Accordingly, the Supreme Court of California reasonably could have concluded based on the record that Petitioner failed to demonstrate how any falsity in Shipp's testimony might have been material or prejudicial.

### 4.     Det. Shipp's testimony re: informing Angela Womble that petitioner was in custody

According to Petitioner, both Det. Shipp and Angela testified falsely at trial regarding

whether Shipp told Angela that Petitioner was in custody at the time of the live lineup attempt and the second photographic lineup.  Petitioner argues that these statements hid the fact that, in telling Angela that Petitioner was in custody, Shipp ensured that Angela would identify Petitioner, and Shipp contributed to Angela's "positive" identification of Petitioner at trial when that identification previously had been tentative.  In addition, according to Petitioner, trial counsel was ineffective in failing to impeach these statements and in arguing to the jury regarding these statements.  However, the Supreme Court of California reasonably could have concluded that Petitioner's arguments were merely conclusory, as there is no basis in the record for Petitioner's assertions.

### 5.    Angela Womble testimony re shotguns

Petitioner claims that Angela testified falsely that she did not know the difference between a shotgun and a rifle.  However, as the Supreme Court of California reasonably could have found, Petitioner did not point to, and there does not appear to be, anything in the record to indicate how this could have been material.

### 6.    Zina Sims' testimony

Zina Sims spoke with Det. Shipp seventeen days after the offense.  She told him that she did not know if Petitioner and Duchine were together when she spoke with them simultaneously by telephone on the night of the offense because it could have been a three-way call.

At trial, Sims testified that, when she and Petitioner finished speaking by telephone on the night of the offense, it sounded like Petitioner then handed the phone to Duchine.  This provided support for the prosecution's theory that Petitioner and Duchine were together at Duckett's house shortly after the offense.

However, the import of Sims's testimony was undercut on cross-examination, when Sims testified that she did not deny telling Shipp that she did not know if Petitioner and Duchine were together because it could have been a three-way call, and she acknowledged that it could have been a three-way call.  Accordingly, the Supreme Court of California reasonably could have concluded that there was no reasonable likelihood that the differences between Sims's statement to Shipp and

her testimony affected the jury's decision or prejudiced Petitioner.[6]

### 7.     Willa Mae Addison's testimony concerning pickup truck

The prosecution sought to establish that Petitioner and Duchine drove Valine Duckett's two-tone, tan-over-brown pickup truck when they departed the Wombles' after the offense.  A photograph of this truck was admitted into evidence at Petitioner's trial.

A neighbor, Willa Mae Addison, testified that she saw the perpetrators depart in a white or cream-colored pickup truck.  To explain the apparent discrepancy between the photograph and Addison's testimony, the prosecutor argued that the jury should infer that Addison could not see the dark-brown color or the two tones from her second-story window above the truck.

Petitioner submitted evidence that Addison's line of vision was such that she could see the side and rear of the truck, which were entirely white or cream-colored, and that she would have seen the brown color.  Even assuming this to be the case, the Supreme Court of California reasonably could have concluded based on the record before it that the difference between dark brown and cream-colored was not reasonably likely to undermine the prosecution's argument, and that Petitioner therefore was not prejudiced by trial counsel's failure to rebut the prosecution's argument.

### 8.     Improper edited tape recording of Shipp/Womble interview

Petitioner claims that the audiotape of Det. Shipp's first interview with Angela Womble contains unexplained record interruptions, despite Shipp's testimony that the tape represented "the entirety of the interview that [he] had with Angela Womble that evening."  One of the interruptions comes at a crucial juncture where Angela is attempting to describe Duchine's companion.  Petitioner

---

[6] Petitioner also complains that trial counsel failed to object to Sims's testimony regarding an encounter she had with Petitioner about a week and a half after the offense.  According to Sims, Petitioner came to her home, but she told him that she would not admit him because police had been "coming by."  Sims testified that Petitioner responded that he "didn't care," and he declared, "Fuck those niggers on Easter Hill. I'm letting them know I'm serious about this shit."  Sims further testified about what she did after Petitioner left.  Petitioner does not explain how the failure to object to these statements might have prejudiced him, so the Supreme Court of California reasonably could have found that Petitioner failed to establish ineffective assistance in connection with these statements.

argues that these record interruptions render the tape inauthentic and inadmissible as evidence, and that trial counsel was ineffective in failing to discover or investigate the record interruptions. According to Norman Perle, an expert in taped audio evidence, "The tape is similar to what one would expect to find if it had been selectively edited or re-recorded to suggest the originality of the Master for the recording."

However, Petitioner did not present the Supreme Court of California with any evidence as to how the tape might have been edited or how such edits were significant. Thus, based on the record before it, that court reasonably could have concluded that Petitioner failed to state a prima facie case that any record interruptions were material or prejudicial.

### 9. Other claims re: ineffective assistance of counsel at guilt phase

Petitioner makes a number of additional assertions of ineffective assistance at the guilt phase of his trial. Based on the record before it, the Supreme Court of California reasonably could have concluded that these assertions lacked merit.

*First*, Petitioner claims that trial counsel was ineffective in calling Officer Cedessia Ervin as a witness. Ervin's testimony essentially repeated the testimony given by Willa Mae Addison and one other neighbor. However, whereas Addison testified that she did not know if the men she saw from her window were black, Ervin testified that Addison had said they were black. As there was no evidence that the perpetrators were *not* black, the Supreme Court of California reasonably could have concluded that Petitioner did not demonstrate how Ervin's testimony could have been prejudicial.

*Second*, Petitioner argues that trial counsel unreasonably failed to produce testimony or to point out to the jury that no incriminating evidence was found in Duckett's pickup truck. Petitioner is incorrect, as trial counsel argued the following:

> Detective Shipp locates that pickup July 3rd. That pickup is used? How come there's no evidence brought to you, huh? How come no blood? How come no hair fiber? How come nothing? No shotgun pellets, nothing out of that pickup? Huh? How come?
> The person that did this obviously has got to be splattered with blood and human matter till heck won't have it. Where is any evidence of that? Where is any clothing or anything else? Where?

*Third*, Petitioner argues that trial counsel unreasonably failed to investigate the possibility that Angela was highly vulnerable to suggestive words or conduct by Shipp, her relatives, and her friends as a result of her hospital medications. However, even assuming that Angela was vulnerable to suggestive words or conduct when she was in the hospital, there is no evidence in the record as to how Angela's testimony would have been different or impeached had trial counsel proved that Angela had a heightened level of suggestibility. In other words, there is no evidence in the record that Shipp, her relatives, or her friends actually subjected Angela to any suggestions. Accordingly, the Supreme Court of California reasonably could have concluded, based on the state-court record, that Petitioner did not demonstrate how he might have been prejudiced by the lack of an investigation into the effects of Angela's hospital medications.

*Fourth*, Petitioner claims that trial counsel unreasonably failed to state on the record his dissatisfaction with the jury as sworn in order to preserve for appeal the issue of the denial of his challenges for cause. However, as the Supreme Court of California reasonably could have recognized, there is no evidence in the record as to how such a failure might have prejudiced Petitioner.

*Fifth*, Petitioner alleges that trial counsel did not adequately investigate and present evidence concerning Petitioner's refusal to participate in a live lineup. This refusal was admitted as evidence of a consciousness of guilt. Petitioner contends that an adequate investigation into his mental health would have revealed that his refusal to participate in a live lineup was in fact due to mental-health problems. Yet there is no evidence in the record that trial counsel did not conduct such an investigation, that an investigation would have yielded the evidence that Petitioner predicts, or that such evidence would have affected the jury's verdict. Accordingly, the Supreme Court of California reasonably could have determined that Petitioner failed to state a prima facie case based on the evidence in the state-court record that trial counsel was ineffective in connection with evidence about Petitioner's refusal to participate in a live lineup.

*Sixth*, Petitioner asserts that trial counsel unreasonably failed to object to many improprieties in the prosecutor's argument to the jury. The Supreme Court of California reasonably could have determined that Petitioner did not state a claim of ineffective assistance in this regard as Petitioner

does not state what was improper in the prosecutor's argument or how any such improprieties prejudiced him.

*Seventh*, Petitioner alleges that trial counsel unreasonably proposed, agreed to, and failed to request modification of various jury instructions. Yet Petitioner does not indicate how the jury instructions might have prejudiced him.

*Eighth*, Petitioner contends that trial counsel unreasonably failed to investigate and to discover the evidence presented in connection with Claim I (actual innocence), which is discussed below. However, there is nothing in the record to indicate that trial counsel could have discovered this evidence, which took habeas counsel years to develop. Indeed, Petitioner argues elsewhere that trial counsel could not have discovered this evidence. The Supreme Court of California therefore could have concluded reasonably that the record before it did not support a claim that trial counsel's investigation in this regard was inadequate.

### 10.    Conclusion re: Claims A and H

The case against Petitioner was weak. However, the Court cannot say that the Supreme Court of California unreasonably denied Petitioner's claims of false evidence and ineffective assistance of counsel at the guilt phase of his trial based on the record that was before that court.

### B.    Claim I – Actual Innocence

In Claim I, Petitioner asserts that he is innocent of capital murder. For purposes of the following discussion, the Court "assume[s] . . . that in a capital case a truly persuasive demonstration of 'actual innocence' . . . would render the execution of [Petitioner] unconstitutional, and warrant federal habeas relief." *Herrera v. Collins*, 506 U.S. 390, 417 (1993); *In re Davis*, 557 U.S. ____, 130 S. Ct. 1, 1–2 (2009) (Stevens, J., concurring) (Supreme Court decisions "clearly support the proposition that it would be an atrocious violation of our Constitution and the principles upon which it is based to execute an innocent person" (internal quotation marks and citations omitted)); *but see id.* at 3 (Scalia, J., dissenting) (Supreme "Court has *never* held that the Constitution forbids the execution of a convicted defendant who has had a full and fair trial but is later able to convince a

habeas court that he is 'actually' innocent"). Petitioner's "threshold showing" to demonstrate his innocence is "extraordinarily high." *Herrera*, 506 U.S. at 417. He is required to make "a stronger showing than insufficiency of the evidence to convict"; he must establish "affirmative proof of innocence." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). Again for purposes of this discussion, the Court will consider the evidence in the light most favorable to Petitioner.

The Supreme Court of California had significant evidence before it that Petitioner might not have committed the crimes of which he was convicted. That court no doubt was aware that the testimony of a single eyewitness, Angela Womble, was essential to the prosecution's case and that all other evidence against Petitioner was circumstantial. Angela was traumatized by the robbery and shootings, and she viewed the perpetrators for only a short time. Angela's initial description of Duchine's companion and her selection of Petitioner's photograph from a lineup were tentative. Angela described Duchine's companion as the "tall dude" or the "taller dude," yet Petitioner is substantially shorter than Duchine. Angela changed the ear in which Duchine's companion had an earring from right to left following conversations with the prosecutor and Shipp; Petitioner had only his left ear pierced. Besides Angela's testimony, the evidence against Petitioner consisted of Petitioner's refusal to participate in a live lineup and evidence that Petitioner's mother owned a truck similar to the one used by the perpetrators, that Petitioner was with Duchine four or five hours before the shootings, and that Duchine might have been with Petitioner at Duckett's house shortly after the shootings.

Evidence at the state evidentiary hearing demonstrated that Petitioner's brother Tim had means, motive, and opportunity to rob Angela with Duchine. Tim had a long-term, extraordinarily close relationship with Duchine, whereas Petitioner had just met him within the prior two weeks. Tim, with Duchine, was engaged in an ongoing turf war with the Hendersons over the crack-cocaine trade in the Easter Hill district of Richmond, and Tim had a reputation as a brutal and violent man who made a living selling drugs and robbing other drug dealers through home invasions. Tim apparently believed that he was owed the money that the Hendersons made dealing drugs in "his" territory. Tim owned and maintained the shotgun that was used in the shootings; he used this shotgun to shoot Kenny Moore in connection with the drug war with the Hendersons just two weeks

1    before the Wombles were shot; Duchine assisted Tim with the Moore shooting.  Both before and

2    after the Womble shootings, Tim kept the shotgun in the trunk of his car.  Tim knew that Duchine

3    could get inside the Womble residence because of his acquaintance with Angela; Petitioner claims

4    he did not.  Tim purportedly discussed plans for robbing the Wombles with a number of people, and

5    later he purportedly confessed his participation in the crimes to multiple people.  Duchine also

6    purportedly told several people that Tim took part in the Womble shootings.  Yet people who would

7    have had information regarding Tim might not have come forward due to the community's distrust

8    of the police and fear of Tim while he was alive; in particular, Duchine's mother believed that her

9    son was afraid of Tim.  Tim's drug use purportedly worsened after Petitioner's trial out of guilt

10   about Petitioner.  Morever, Petitioner and Tim may have been similar in appearance.

11        Some time after Duchine's conviction for his participation in the Womble shootings, he

12   contacted representatives of Petitioner to say that it was Tim, not Petitioner, who accompanied him

13   to the Wombles'.  In 1992, Duchine signed a declaration so stating.  Duchine confirmed the accuracy

14   of this declaration to Petitioner's representatives, including one of his present attorneys, Lynne S.

15   Coffin, in 1993 and 1995.  But in 1996, Duchine purportedly told an investigator and Coffin that,

16   although he stood by the 1992 declaration, he had no intention of testifying for Petitioner at an

17   evidentiary hearing because he believed that the testimony would hurt his chances of appeal and for

18   parole.  At the state-court evidentiary hearing, Duchine recanted his declaration.

19        The evidence indicates that Tim was involved in the Womble shootings.  At the very least,

20   he apparently supplied the murder weapon.  He probably was involved in planning the crime.  And

21   it is certainly possible that he directly participated in the crime, considering that the case against

22   Petitioner was quite weak.  But the evidence in the record does no more than cast doubt on

23   Petitioner's guilt; it does not affirmatively prove his innocence.  Accordingly, the Supreme Court

24   of California was not unreasonable in determining that the record before it did not establish

25   Petitioner's innocence.[7]

26

27        [7] If Petitioner additionally had submitted compelling alibi evidence at the state-court evidentiary
     hearing, he might have proved his innocence.  Petitioner intended to submit alibi evidence at the hearing, but

28   the referee did not permit him to do so.  The Supreme Court of California upheld the referee's decision,
     finding that "the record fails to demonstrate that petitioner had actual alibi evidence to present or what it

**C.      Claim P – Ineffective Assistance of Trial Counsel at Penalty Phase**

In Claim P, Petitioner asserts that he was denied the effective assistance of counsel during the penalty phase of his trial.[8]  To obtain relief on this claim, Petitioner must satisfy the test set forth in *Strickland*, 466 U.S. 668, which is discussed above in connection with Claim H.  In short, Petitioner must demonstrate both deficient performance by counsel and resulting prejudice.

**1.      Evidence presented at the penalty phase of trial**

At the penalty phase of the trial, the prosecution established Petitioner's prior conviction for the voluntary manslaughter with a firearm of Vernon Hood.  Petitioner was paroled from prison on the manslaughter conviction on June 25, 1986, six days before the Womble shootings.  Petitioner's parole officer testified that he saw Petitioner the following day but never saw him again.  The prosecution also introduced evidence of a prior unadjudicated battery:  a police officer testified that he arrested Petitioner after seeing Petitioner punch someone in the mouth.

The first penalty-phase witness for the defense was the principal of an elementary school that Petitioner had attended.  The principal said that Petitioner had been in "a fight or two" but "was as well adjusted as any other child his age," although he did not know how well Petitioner had done academically.   The principal further testified that he was very familiar with the Easter Hill neighborhood, where the school was located, and the Easter Hill housing project, where Petitioner lived.  Easter Hill was a low-income area where drugs were sold.  The principal also testified that he knew Petitioner's family for many years, that he was familiar with Petitioner's mother, and that as far as he knew there was no father figure in the home.  He denied that he saw children on the streets of Easter Hill at night.

_____

might have been."  But the record *could* not contain alibi evidence precisely *because* the referee did not permit Petitioner to present it.  The state court's reasoning in this regard is entirely circular and, accordingly, unreasonable.

[8] Claim P has been stricken from the Petition to the extent that it asserts that trial counsel was ineffective for not making an opening statement at the penalty phase, for not making an effective closing argument at the penalty phase, and for not objecting to the prosecutor's closing argument about Petitioner's future dangerousness.

The defense sought to put the Hood killing in context. Petitioner's sister, Gladys Reese, testified that she lived with Hood for about three years, and he fathered one of her children. Reese described her relationship with Hood as a "nightmare." He used to steal her money and to beat her and her children. He once put an unloaded gun into her mouth, and he handcuffed one of her children to a bed. Because of the beatings, Reese moved back to Duckett's house, where Petitioner also was living. Hood came to Duckett's house several times and threatened to kill Reese and Duckett. Reese was scared of Hood.

Petitioner's sister Renee Morgan described conditions in Petitioner's family growing up. There were nine children in the family, and no father. The mother, Valine Duckett, drank. Petitioner protected and took care of the younger children. Morgan saw Hood beat Reese and her children, and Hood came to their house with guns. Morgan stated that she did not see a difference between a sentence of life without the possibility of parole and the death penalty, although she would choose life so she could visit Petitioner.

Valine Duckett was the final witness. She corroborated Reese's testimony about Hood. Duckett also testified about Petitioner's childhood. She stated that she left her first husband, who was Petitioner's father, in Mississippi and moved to California while she was pregnant with Petitioner, who was born in 1961. Petitioner's father saw his children no more than a few times, and Petitioner was always disappointed in his father. Duckett remarried. She fought with her second husband three to five times a week. When Petitioner was five years old, Duckett killed her husband in self-defense while Petitioner and the other children watched. Duckett described the fight in detail: she and her husband were cursing and drew knives on each other; her husband threatened her with a crowbar; she ran into the bathroom and locked herself in, but her husband broke the door down and hit her; as they fought violently in front of the children, Duckett stabbed her husband, and he died. Duckett also stated that Petitioner did well in school and was her only son to graduate from high school. Duckett said that she was too confused to say whether her son should live or die.

1

### 2.   Additional mitigation evidence

2    In connection with his state habeas petition, Petitioner adduced the following additional

3    mitigation evidence.  He claims that trial counsel was ineffective in failing to investigate, discover,

4    and present this evidence.

5    There were many additional examples of the violence that Petitioner experienced and

6    observed as a child.  When Petitioner was only ten months old, he was taken to the hospital with

7    first- and second-degree burns on his hands.  At eighteen months, he was taken to the emergency

8    room after he apparently got diluted ammonia in his eyes.  Petitioner returned to the emergency

9    room yet again at age two after he ingested some rubber cement, believing it to be toothpaste.

10   Both Duckett and her husband were severely dependent on alcohol, and they got drunk at

11   least a few times a week.  They routinely hit, whipped, and threw things at Petitioner and the other

12   children.  Once, when Duckett was eight months pregnant, her husband knocked her down a flight

13   of stairs; Duckett then pulled out a gun and shot her husband, trying to kill him.  Her husband once

14   told the children, "I'm going to kill all of you."  He tried to burn the house down a number of times,

15   and he put rat poison in the children's food.  One time, he threw a glass at Petitioner, which

16   shattered on Petitioner's head.

17   After her husband's death, Duckett became more depressed and dysfunctional.  She started

18   drinking — and got drunk — every day; she also smoked marijuana daily.  Duckett made multiple

19   suicide attempts.  Meanwhile, Petitioner had nightmares about being killed by Duckett's husband.

20   Duckett would feed her children bread and water after her welfare check ran out in the middle of

21   each month.  The house was always filthy, with rats, roaches, and dirty diapers throughout.  Duckett

22   continued to be violent with her children after her husband died, whipping Petitioner sometimes until

23   he bled.  Duckett became sexually involved with several men, three of whom fathered additional

24   children with her; all of the men were alcoholics and criminals, and many or all were abusive.

25   By the time he was seven years old, Petitioner was staying out on the streets late into the

26   night.   At age seven, Petitioner was hit by a car; his leg was broken and he was knocked

27   unconscious.

28   Petitioner attended extremely poor, inadequate, and racially segregated elementary schools,

and he was exposed to substantial racial discrimination in junior high school. Petitioner was "slow," and he did not learn to read until he was in juvenile hall in seventh grade. For high school, Petitioner attended La Cheim School, a private school for children with intellectual and behavioral problems. Petitioner was well respected at La Cheim.

Petitioner had multiple run-ins with law enforcement as a child. He was charged with malicious mischief when he was only nine years old. When he was eleven, he began smoking marijuana, and he was charged with burglary. At thirteen, Petitioner was charged with attacking a teacher, and he was sent to juvenile hall for the first time; conditions at the juvenile hall were deplorable. A report stated, "Willie's behavior is explained as rooted as being socialized in a home in which it was necessary frequently to grab the nearest object to protect oneself from other members of the family." At sixteen, Petitioner was arrested for possession of marijuana for sale. The contemporaneous probation report stated that "Willie's history of delinquency can be partially explained by the fact that he has grown up in an area where violence and antisocial behavior are commonplace."

Nearly all of Petitioner's siblings had similar histories. One brother was shot to death in 1975 in a drug-related incident. By 1977, another was imprisoned at San Quentin State Prison, having been convicted of murder. In addition, a number of Petitioner's friends and family members were victims of murder. Petitioner himself was shot in a drive-by shooting in 1981.

Petitioner also offered detailed historical and sociological information about Richmond and its Easter Hill housing project, as well as greater detail about Hood and Petitioner's manslaughter conviction for killing Hood (including evidence purportedly showing Petitioner's innocence of that crime). Finally, Petitioner submitted expert declarations as evidence of his intellectual and neuropsychological impairments.

### 3.    Analysis

The Court cannot say that the Supreme Court of California was unreasonable in concluding that there was not a reasonable probability that the outcome of the penalty phase of Petitioner's trial would have been different if the mitigation evidence developed on state habeas had been presented

at trial.[9]   The evidence submitted to the jury demonstrated that Petitioner grew up in an extraordinarily violent family and community.   The new evidence adduced on habeas added tremendous detail to the evidence presented at trial, but on the whole it was not a difference in kind. Thus, the Supreme Court of California reasonably could have concluded that most of the new evidence was duplicative, and accordingly the failure to present it was not prejudicial.   *See Pinholster*, 131 S. Ct. at 1409–10.

There are two categories of evidence developed on habeas that were not duplicative.   The first was evidence that Petitioner did not kill Hood.   However, Petitioner stood convicted of killing Hood, and the new evidence was equivocal at best.   The Supreme Court of California reasonably could have concluded that the submission of the new evidence likely would have done no more than damage trial counsel's credibility in arguing to spare Petitioner's life.   The state court also could have reasonably concluded that it was in Petitioner's interest to leave the specific circumstances of Hood's death vague, as the jury could then infer that killing Hood was to some extent justified.

The second category of nonduplicative evidence indicated that Petitioner suffers from intellectual and neuropsychological impairments.   This evidence effectively contradicts Duckett's testimony that Petitioner did well in school.   Nonetheless, the Court is not persuaded that it would have been unreasonable to find that Petitioner was not prejudiced by the failure to present this evidence.   The evidence did not include a diagnosis of any mental disorder — not even an Axis II personality disorder, much less an Axis I clinical disorder.   *See generally* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 27–30 (4th ed. text rev. 2000).   At most, the evidence indicated that Petitioner was "slow," but not mentally retarded or ill.   Accordingly, the Supreme Court of California reasonably could have concluded that the failure to present the evidence of Petitioner's intellectual and neuropsychological deficits that was in the record before it did not prejudice Petitioner.   *Cf. Pinholster*, 131 S. Ct. at 1410.

---

[9] For purposes of this discussion, the Court assumes without deciding that trial counsel's performance at the penalty phase was deficient.

1
      **D.**    **Claim Q – Juror Misconduct**

2
      In the portion of Claim Q as to which the Court granted an evidentiary hearing, Petitioner

3
alleges that juror misconduct violated his rights in that the jury was exposed to and discussed

4
unreliable extra-record statements during deliberations.  To support this claim, Petitioner submitted

5
a juror's declaration that a "question of lingering doubt arose during the guilt phase based on how

6
long it would take, point to point, to travel from the crime scene to [Duckett]'s house, where a phone

7
call was received at a given time."  According to this juror, the question was answered based on one

8
or two jurors' "personal knowledge" of Richmond.

9
      The Supreme Court of California reasonably could have concluded that there was no basis

10
in the record for finding that Petitioner was prejudiced by the consideration of jurors' familiarity

11
with Richmond.  It is true that the prosecution's theory was that Petitioner and Duchine were

12
together at Duckett's house shortly after the Womble shootings.  In part to support this theory, the

13
prosecution produced Hawkins' and Sims' testimony regarding a telephone call with Petitioner and

14
Duchine after the shootings.  However, as discussed above in connection with Claim A, the import

15
of this testimony was undercut on cross-examination such that it was not proved that Petitioner and

16
Duchine were together, much less that they were together at Duckett's house, after the offense.  The

17
jury nonetheless found Petitioner guilty.  Based on this record, it would not have been unreasonable

18
for the Supreme Court of California to determine that it was unlikely that jurors' independent

19
knowledge of Richmond had an effect on either the guilt-phase or penalty-phase verdict.

20

21
**IV.**    **CONCLUSION AND DIRECTIONS FOR FURTHER BRIEFING**

22
      In its June 1, 2011 post-*Pinholster* Order, this Court stayed the previously-scheduled

23
evidentiary hearing pending resolution of preliminary 28 U.S.C. § 2254(d)(1) questions.  Those

24
questions have been addressed in this order.

25
      The Court therefore directs counsel to brief the question of what issues, and in what format,

26
remain to be resolved.  The Court is particularly concerned about the adequacy of the record with

27
respect to actual innocence and alibi evidence.

28
      As another judge on this Court has observed, "*Pinholster*, though seemingly straightforward

and unambiguous, actually raises more questions than it provides answers regarding a district court's ability to conduct evidentiary hearings and permit new evidence in federal habeas proceedings." *Rodriguez v. Adams*, No. 4-4-cv-2233-PJH, slip op. at 3 (N.D. Cal. Feb. 24, 2012).  The Ninth Circuit has outlined some of these questions in *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011) and *Johnson v. Finn*, 665 F.3d 1063, n.1 (9th Cir. 2011).

In this case, in light of the lack of any physical evidence connecting Petitioner to the offense, the fragile nature of the eyewitness identification provided and the powerful nature of the evidence linking Petitioner's brother to the crime, it is critical to proceed cautiously in the newly-defined post-*Pinholster* landscape.  The parties have not yet had an opportunity to brief these issues in this rapidly changing area of the law.

Accordingly, the parties jointly shall file a proposed briefing schedule by April 27, 2012.


**IT IS SO ORDERED.**


DATED:  March 30, 2012                    _____
                                          SUSAN ILLSTON
                                          United States District Judge

25