UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>WILLIE JOHNSON,<br><br>               Petitioner,<br><br>       v.<br><br>RON BROOMFIELD, Warden, San Quentin State Prison,<br><br>               Respondent.</td><td>Case No. 98-cv-4043-SI<br><br><u>DEATH PENALTY CASE</u><br><br>**ORDER REGARDING CLAIMS I AND H (INEFFECTIVE ASSISTANCE OF COUNSEL SUBCLAIM)**</td></tr>
</table>

**INTRODUCTION**

On June 15, 2016, this Court granted Petitioner's request for an evidentiary hearing on Claim I of his habeas petition alleging actual innocence. ECF No. 379. The evidentiary hearing was held from March 19 to 21, 2018. ECF Nos. 450-52. Petitioner filed an opening brief on the merits of his claim on February 8, 2019. ECF No. 493. Respondent filed an opposition and Petitioner replied. ECF Nos. 508, 517. Oral argument was heard on August 23, 2019. ECF No. 526. The parties subsequently briefed the merits of the ineffective assistance of counsel subclaim of claim H. ECF No. 531, 532 & 535. The claims are fully briefed and ready for disposition. Based on the record presented to date, the Court finds and orders as follows.

**FACTUAL BACKGROUND**

In 1987, a jury convicted Petitioner of the murder of Mrs. Willie Womble, the attempted murder of Ms. Angela Womble, robbery of an inhabited dwelling, and first-degree burglary. The jury found the robbery and burglary felony-murder special-circumstance allegations true, and found that Petitioner personally used a firearm in the commission of these offenses and inflicted great

United States District Court
Northern District of California

bodily injury in the commission of the attempted murder, the robbery, and the burglary. Following a penalty trial, the jury sentenced Petitioner to death.

Evidence at trial showed that two men, John Allen Duchine and another man, arrived at the home of Willie Womble and her adult daughter, Angela Womble, in the Easter Hill neighborhood of Richmond, California, between 9:45 and 10:00 p.m. on July 1, 1986.[1] They knocked on the door, and Duchine, who was acquainted with Angela Womble, identified himself and asked for a ride to the gas station. Angela opened the door and Duchine and the other man pushed their way inside. The other man carried a shotgun, and Duchine a rifle. They demanded Angela give them "Tee's money," believing Angela was hiding money for her child's father, Terrance Henderson, a reputed drug dealer. When Angela could not produce the money, the other man shot Angela's mother, Willie Womble, in the back of the head, killing her. The other man and/or Duchine shot Angela as well, but she survived.

The next day, detectives interviewed Angela at the hospital where she was being treated for her gunshot wounds. Angela identified Duchine by name. She stated she had never seen the second man before, but had heard that his name was Willie Johnson. Angela picked Petitioner's photo out of a photo line-up, stating she was "pretty much sure" he was the second shooter.

Investigators believed that Petitioner was the second man involved in the shootings. On July 17, 1986, while Petitioner was in custody, detectives arranged for Angela to view a live lineup. Petitioner was appointed an attorney to represent him at the lineup and advised that his refusal to participate in a lineup could be used in evidence against him. Petitioner refused to participate in the lineup.

As there was no physical evidence linking Petitioner to the shooting, the prosecution's case hinged primarily on Angela's identification. The prosecution also presented the testimony of Ketcia Hawkins, who saw Duchine and Petitioner together in Easter Hill between 5:00 and 6:00 p.m. on the evening of the murder, and that of Petitioner's cousin, Zina Sims, who spoke to both men on the

---

[1] Except where otherwise noted, the recitation of the factual background of this case is based on the California Supreme Court's opinion disposing of Petitioner's direct appeal, *People v. Johnson*, 3 Cal. 4th 1183 (1992).

telephone around 11:00 p.m. on the night of the murder.  During that phone call, Zina informed Petitioner that "the mother had died and the daughter didn't."  Petitioner responded, "The daughter didn't die?"  CT (Clerk's Transcript) 314.  Zina also testified that a few days after the murder, Petitioner came by her house in the middle of the night.  Zina told Petitioner that the police had been coming by and people had been harassing her.  Petitioner responded, "Fuck those niggers on Easter Hill.  I'm letting them know I'm serious about this shit."  RT (Reporter's Transcript) 3206-07, 3223.

Petitioner presented a misidentification defense.  He called a professor of psychology, Dr. Elizabeth Loftus, to testify about the factors affecting human perception, memory, and identification.

Duchine's trial took place after Petitioner was tried and convicted.  Duchine testified that Petitioner was the second shooter.  He claimed he had no idea that Petitioner had guns in his car or intended to rob anyone until they arrived at the Womble house.  Duchine testified that he only went along with Petitioner's plan because he was afraid for his life, and hoped he could prevent the Wombles from being hurt or killed.  Answer Ex. 170.

## PROCEDURAL HISTORY

On July 20, 1992, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  Answer Ex. 92.  The petition raised a claim of actual innocence and included a declaration from John Allen Duchine stating Petitioner's brother, Tim Johnson, who died in 1989, shot and killed Willie Womble.  *Id.*, Ex. 36.  The California Supreme Court ordered an evidentiary hearing on the specific question of whether petitioner "is factually innocent of the murder of Willie Womble, in that his deceased brother, Timothy Johnson, committed the crime."  *In re Johnson*, 18 Cal.4th 447, 451 (1998).  The court appointed a referee, who made factual findings and credibility determinations following the hearing.  *Id.* at 456-57.  The referee did not permit Petitioner to present alibi evidence.  *Id.* at 457-58.  Ultimately, the referee held that Petitioner, not his brother, was present at the robbery and responsible for Willie Womble's death.  *Id.* at 456.  The California Supreme Court found that substantial evidence supported the referee's findings and denied the entirety of Petitioner's state habeas petition on the merits.  *Id.* at 469.

Petitioner filed his petition for writ of habeas corpus in this Court in 1998. ECF No. 1. On March 10, 2004, this Court granted Petitioner an evidentiary hearing on Claims A, H, I, P, and part of Claim Q. ECF No. 119. Following the issuance of *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Court granted Respondent's motion to reconsider the grant of an evidentiary hearing and asked the parties to brief Petitioner's entitlement to relief under 28 U.S.C. § 2254(d)(1) for those five claims. ECF No. 287. The Court ultimately found that Petitioner had not shown that he was entitled to relief under § 2254(d)(1). ECF No. 317. The Order, however, noted that the California Supreme Court's decision denying Claim I may have been unreasonable under 28 U.S.C. § 2254(d)(2). *Id.* On June 15, 2016, the Court concluded that as to Claim I, the California Supreme Court's fact-finding process was unreasonable in light of its restrictive narrowing of the claim presented to it and its refusal to consider Petitioner's alibi evidence. ECF No. 379. The Court granted Petitioner's request for an evidentiary hearing on Claim I and deferred ruling on the merits of the sub-claim of Claim H that alleges ineffective assistance of counsel during the guilt phase of Petitioner's trial based on counsels' failure to investigate and discover the evidence presented in connection with Claim I, until after the evidentiary hearing on Claim I. *Id.*

The evidentiary hearing took place on March 19, 20, and 21, 2018. ECF Nos. 450-52. The parties submitted post-evidentiary hearing briefs on the merits of Claim I, and the Court heard oral argument on August 23, 2019. ECF No. 526. The parties subsequently briefed the merits of the ineffective assistance of counsel subclaim of claim H.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the court should not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A federal court must presume the correctness of the state

United States District Court
Northern District of California

court's factual findings.  28 U.S.C. § 2254(e)(1).

In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's constitutional claim de novo, and "may consider evidence properly presented for the first time in federal court."  *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (citing *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011)).  If constitutional error is found, however, habeas relief is warranted only if that error "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *accord Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).

## DISCUSSION

A.  <u>Claim I - Actual Innocence</u>

1.  **State Court's Factual Findings**

In its order dated June 15, 2016, this Court determined that the state court's denial of Claim I was an unreasonable interpretation of the facts in light of the evidence presented to it, by virtue of the state court refusing to consider Petitioner's alibi evidence.  ECF No. 379 at 5-6.  Consequently, Petitioner was permitted to present additional evidence in support of his claim of actual innocence at an evidentiary hearing.  Petitioner presented six witnesses.  The relevant record before this Court now includes Petitioner's 1987 trial; the 1996 evidentiary hearing in state court focused on evidence of the guilt of Petitioner's brother, Tim; and the 2018 evidentiary hearing focused primarily on Petitioner's alibi evidence.

Having met his burden under section 2254(d), this Court reviews Petitioner's Claim I *de novo*.  *See* ECF No. 508-4 at 1; *Hurles*, 752 F.3d at 778.  However, the state court's factual findings,

specifically as to witness credibility, are entitled to deference unless they are not fairly supported by the record. *See Carriger v. Stewart*, 132 F.3d 463, 473 (9th Cir. 1997); *see also Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) (federal habeas review gives federal courts "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them"). Petitioner urges this Court to disregard the state court's credibility findings and "undertake its own factual inquiry" regarding the witnesses who testified in 1996 about Tim's guilt. Petitioner contends that "the state court's restrictions on the scope of evidence to be presented at the hearing were so severe and the focus of that hearing so narrow (excluding all consideration of possible alibi), that its factfinding cannot be trusted." ECF No. 517 at 24. The Court finds no merit to this proposition. Petitioner does not explain how the state court's refusal to consider his alibi evidence undermined its ability to evaluate the credibility of the witnesses that testified before that court regarding Tim Johnson's participation in the murder. Having reviewed the 1996 evidentiary hearing transcript and exhibits, the Court finds the state court's fact-findings are fairly supported by the record and are thus entitled to deference.

### 2.    Standard of Proof for Freestanding Claim of Actual Innocence

Whether a freestanding innocence claim is cognizable under federal law is an open question. In *Herrera v. Collins*, the Supreme Court stated that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." 506 U.S. 390, 400 (1993). Nevertheless, "for the sake of argument in deciding [the] case," the Supreme Court assumed that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417. In *Herrera*, the Supreme Court concluded that the petitioner fell "far short" of the "extraordinarily high" threshold for succeeding on a freestanding innocence claim, and thus avoided deciding whether such a claim is cognizable. *Id.* at 417-19. Since that time, the Supreme Court has repeatedly "decline[d] to resolve this issue[.]" *House v. Bell*, 547 U.S. 518, 555 (2006); *see also, e.g., Dist. Attorney's Office for Third Judicial*

United States District Court
Northern District of California

*Dist. v. Osborne*, 557 U.S. 52, 71-72 (2009).

In *Carriger v. Stewart*, the Ninth Circuit followed suit, assuming without deciding that an "execution of an innocent person would violate the Constitution." 132 F.3d at 476. The court concluded that the standard of proof for such a claim must be at least as high as the standard articulated in Justice Blackmun's dissent in *Herrera*, i.e., a petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Id.* (citing *Herrera*, 506 U.S. at 442-44 (Blackmun, J., dissenting)). Upon examination of the petitioner's claim, the *Carriger* court found petitioner's evidence of innocence met the standard required to establish a "gateway" claim under *Schlup v. Delo*, 513 U.S. 298 (1995), but did not meet the necessarily higher standard to establish a freestanding actual innocence claim. *Id.* at 477-78.[2]

Here, Petitioner acknowledges the high standard contemplated by *Herrera* and *Carriger* but nonetheless urges this court to apply the lower, *Schlup* standard. ECF No. 493 at 13-14. Petitioner asserts that *Herrera* was "decided at a time [i.e., 1993] when it was widely assumed . . . that conviction of an actually innocent person is an exceedingly rare phenomenon, justifying a very high standard of proof[.]" ECF No. 493 at 14. According to Petitioner, it is now known that a wrongful conviction is much more common than previously believed, justifying a lower standard of proof. *Id.*

Petitioner cites no authority to support the proposition that the prevalence of wrongful convictions informed the Supreme Court's decision in *Herrera*, and nothing in the *Herrera* decision supports that assertion.[3] Moreover, even setting that matter aside, this Court is bound by circuit authority—both the black letter rule and the mode of analysis of binding precedent—and must

---

[2] In *Schlup*, the Court set forth the standard for "gateway" actual innocence claims, permitting a habeas petitioner to have considered on the merits claims of constitutional error that would otherwise be procedurally barred: "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 327. The Court noted that this "more likely than not" standard imposed a lower burden of proof than the "clear and convincing" standard. *Id.*

[3] In fact, the Court in *Herrera* articulated different reasons for the high standard required: "[B]ecause of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high." 506 U.S. at 417.

therefore reject Petitioner's request to apply a more lenient standard of proof to his claim. *See Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("[C]aselaw on point *is* the law. . . .  In determining whether it is bound by an earlier decision, a court considers not merely the reason and spirit of cases but also the letter of particular precedents.  This includes not only the rule announced, but also the facts giving rise to the dispute, other rules considered and rejected and the views expressed in response to any dissent or concurrence." (citation and internal quotation marks omitted)).

### 3.    Analysis

Having determined the applicable standards governing its analysis, the Court turns to Petitioner's claim.  Petitioner's actual innocence claim is based on two categories of evidence: (1) evidence of the guilt of Petitioner's brother Tim; and (2) evidence of Petitioner's alibi.

#### a.    Evidence of Tim's Guilt

At the 1996 evidentiary hearing in state court, Petitioner presented evidence that Petitioner had been sentenced to prison in 1981 and released in 1986, only a few days before the Womble murder.  In the intervening five years, Petitioner's Easter Hill neighborhood in Richmond had been inundated with crack cocaine, and the Henderson brothers (Terrance and Mike) had become powerful local drug dealers.  Additionally, Tim Johnson, petitioner's brother, had become a violent, unpredictable crack user and close friend of John Allen Duchine.

Shortly before petitioner's release from prison, Duchine and Tim were involved in a shootout related to a dispute with the Hendersons.  The shotgun Tim used in the shootout was the same one used to kill Willie Womble several weeks later.

Petitioner argued it was much more likely that Tim, entrenched in the ongoing Easter Hill turf war and closely aligned with Duchine, robbed and shot the Wombles, than that Petitioner, not previously involved in crack dealing or well-acquainted with Duchine, committed the murder only days after his release from a lengthy prison term.

In the 1996 hearing, Petitioner called four witnesses who testified that Tim made statements

8

1    about planning a robbery in the weeks leading up to the Womble murder.  Two witnesses, King

2    Arthur Wilson and Barbara Nichols, testified that Tim actually confessed to killing Willie Womble,

3    and three more gave evidence of more ambiguous statements by Tim indicating he felt guilt or

4    remorse about the killing or Petitioner's conviction.

5         Petitioner also called Duchine as a witness.  Prior to the hearing, Duchine had sent the court

6    a letter recanting his 1992 declaration implicating Tim in the murder.  On the witness stand, Duchine

7    again recanted his 1992 declaration.  Duchine testified, consistent with his testimony at his own

8    trial, that Petitioner was the second shooter.  He explained that he felt threatened and pressured into

9    signing the 1992 declaration to save Petitioner's life, but he was no longer willing to do anything

10   that might hinder his own chances at post-conviction relief.

11        Following the evidentiary hearing, the referee appointed by the court found that Petitioner

12   had not met his burden of establishing his innocence based on evidence of Tim's guilt and made

13   additional findings related to the credibility of the witnesses who testified before him.  *Johnson*, 18

14   Cal. 4th at 456-57.  The referee credited Duchine's hearing testimony implicating Petitioner, rather

15   than the 1992 declaration implicating Tim Johnson.  *Id.*  He considered Duchine's demeanor while

16   testifying, and that Duchine's testimony at the hearing was consistent with his testimony at his own

17   trial, where he admitted being present at the Womble robbery and murder.  *Id.*  The referee

18   concluded that the evidence did not establish a credible motive for Duchine to have falsely

19   implicated Petitioner at Duchine's trial, and that Duchine plausibly explained why he signed the

20   1992 declaration.  *Id.* at 456.  The referee also found the witnesses who testified about Tim's

21   purported admissions lacked credibility—the declarant (Tim) was dead at the time of the hearing,

22   the witnesses had all been convicted of crimes of moral turpitude, and the witnesses failed to come

23   forward with this crucial evidence until years after Petitioner's conviction and Tim's death.  *Id.* at

24   457.  The referee further found King Arthur Wilson's and Barbara Nichols's testimony incredible

25   because it was "implausible in material details, as well as inconsistent internally and in relation to

26   [their] prior statements."  *Id*.

27        As discussed above, Petitioner does not point to any specific portion of the state court's

28   reasoning that he contends is not fairly supported by the record.  Having reviewed the evidentiary

United States District Court
Northern District of California

9

1   hearing record and state court decisions, this Court concludes that the credibility findings are

2   supported and deserving of deference.   Duchine's declaration and witness testimony regarding

3   Tim's confessions constitute the only direct evidence of Tim's guilt for the Womble murder, and

4   this evidence was not deemed credible by the state court.   As the state court observed, the remaining

5   circumstantial evidence presented by Petitioner in 1996, including Tim's statements about planning

6   a robbery and statements of remorse or guilt after the robbery, tends to show Tim may have planned

7   or otherwise participated in the robbery, but does not tend to exonerate Petitioner.

8        At the evidentiary hearing in 2018, Petitioner presented the testimony of his younger brother,

9   James Eric Wright ("Eric").   Eric did not serve as an alibi witness, but instead testified to an incident

10  that allegedly occurred just before the Womble murder and about the day of the murder.   Eric stated

11  that on June 30, 1986, he helped Tim and Duchine steal a hand truck from a local U-Haul facility.

12  The next day, he gave Duchine the keys to his mother's truck while she was sleeping.   EHRT 195-

13  98.   Duchine drove away in the truck and returned it later that night.   EHRT 201-03.   After Eric's

14  mother went to work, Tim came to the house and asked Eric to take a ride with him.   EHRT 206-

15  07.   They went to a motel and Eric grabbed a backpack that was in a chair.   They then drove a

16  distance to a vicinity close to railroad tracks.   Tim asked Eric to throw the backpack out a window.

17  EHRT 209-11.   They then drove back to Eric's mother's house.   EHRT 211-12.   At the time of this

18  incident, Eric was approximately sixteen years old.

19       Eric's testimony did not establish Tim's guilt.   The contents of the backpack have never been

20  identified.   The significance of the hand truck is also unclear, as there is no evidence that it was used

21  in any way during the murder.   In any event, Eric was not a credible witness.   He is Petitioner's

22  younger brother and has numerous convictions.   EHRT 176-177, 190, 222-24.   He attended

23  Petitioner's trial and state evidentiary hearing, and yet did not reveal his version of events until

24  2018, thirty-one years after the murder.   Furthermore, Eric's testimony conflicts with previous

25  statements he gave to investigators much more contemporaneously to the murder.   EHRT Ex. 109

26  at 3204, Ex. 117 at 3573-76, Ex. 124 at 4-5.

27       Overall, the evidence presented to show Tim's guilt is insufficient to establish Petitioner's

28  innocence.   Accordingly, the Court turns to evidence of Petitioner's alibi.

United States District Court
Northern District of California

**b.      Evidence of Petitioner's Alibi Presented in 2018**

The Womble murder occurred at approximately 9:30 or 10:00 p.m. on July 1, 1986, in Richmond, California.  The gist of Petitioner's alibi is that he was visiting his ex-girlfriend, Nena Johnson, at that time.   Petitioner's friend, Sedrick Henderson (unrelated to Terrance and Mike Henderson), drove with him to Nena's home, Nena came out and spoke with Petitioner, and Nena then got into the car with Petitioner and Sedrick.  Nena and Petitioner dropped Sedrick off at his home and then proceeded to Nena's friend, Wanda Smith's, motel room, where they continued to talk.  Eventually, Petitioner drove Nena home, where they chatted outside for a bit before she went inside.  Petitioner then returned to Sedrick's house and then went home.

Sedrick, Nena, Wanda, and Petitioner all testified about these events at the hearing in 2018.

**i. Sedrick Henderson**

At the March, 2018 evidentiary hearing, Sedrick Henderson, Petitioner's childhood friend, testified that on the morning of July 1, 1986, he and Petitioner went shopping for clothes in San Francisco.  EHRT (Reporter's Transcript of the 2018 evidentiary hearing) 115.  In the evening, Sedrick and Petitioner went to the home of Petitioner's ex-girlfriend, Nena Johnson.  When it was "close to dark" outside, Petitioner and Nena dropped Sedrick off at his home.  EHRT 151.  Petitioner returned to Sedrick's house later that evening, before it got dark.  EHRT 152.

In contrast, at his 2018 deposition before the evidentiary hearing, Sedrick testified that he and Petitioner went to see Nena in the morning, Petitioner and Nena dropped Sedrick off around noon, and Petitioner came by his house later in the evening around 6:00 p.m. and stayed for about 1.5 hours.  EHRT 120-21, 132.  At the deposition, Sedrick also stated that he was not sure of the date of the murder or whether he heard about the murder the day after he and Petitioner visited Nena Johnson.  EHRT 137-38.

When Petitioner's investigator interviewed him in 1996, Sedrick stated that he went to San Francisco with Petitioner on July 1, but did not tell the investigator that they went to visit Nena Johnson later that day.  On cross-examination at the evidentiary hearing in 2018, Sedrick stated that

11

United States District Court
Northern District of California

1    he failed to tell the investigator about visiting Nena later that day because the investigator did not

2    ask.  EHRT 147-48.

3         As set forth above, there are significant inconsistencies between Sedrick's hearing and

4    deposition testimony regarding whether the visit to Nena happened in the morning, well before the

5    murder took place, or some time later in the evening.  Sedrick's testimony that he was with Petitioner

6    in the morning, shopping in San Francisco, is also inconsistent with Petitioner's own testimony,

7    discussed *infra*, that he was not with Sedrick that morning but with another friend, Denny, in San

8    Jose.  For these reasons, this Court accords little weight to Sedrick's testimony.

9         Sedrick's credibility is further undermined by his failure to make any reference to the crucial

10   encounter with Nena Johnson when he was interviewed by Petitioner's investigator in 1996.

11   Sedrick's explanation—that he did not disclose this information because the investigator did not

12   ask—is implausible given the context of the interview, which was in preparation for a hearing on

13   Petitioner's actual innocence, and where Sedrick otherwise provided the investigator with a

14   narrative of his and Petitioner's activities on July 1.  Finally, even giving credence to the version of

15   events most favorable to Petitioner, Sedrick testified that Petitioner left Sedrick's home at about

16   7:30 that evening, a full two hours before the robbery and murder occurred.

17

18                  **ii.      Nena Johnson**

19        Nena Johnson, Petitioner's ex-girlfriend, testified that on July 1, 1986, Sedrick Henderson

20   and Petitioner came to her house.  Nena and Petitioner dropped Sedrick off and went to Wanda

21   Smith's hotel room, where they talked for 3-4 hours.  Petitioner drove Nena back to her home and

22   they talked for some time outside before Nena went inside.  EHRT 326.  Nena did not testify

23   regarding the time of day of these events.

24        Nena acknowledged that at the 1996 evidentiary hearing, she testified that she did not

25   remember the date of the Womble murder.  EHRT 335.

26        Nena's failure to testify about the time of day that these events occurred, and her uncertainty

27   about when the encounter happened relative to the murder undermines the exonerating value of her

28   testimony.  While this visit from Petitioner may very well have occurred, Nena did not provide any

evidence that it occurred at the time of, or even on the day of, the murder.

### iii.    Wanda Smith

Wanda Smith, the ex-girlfriend of Tim Johnson and the mother of his child, testified that around the time that Petitioner got out of prison, Petitioner and Nena showed up at her hotel room. EHRT 289.  It was dark outside.  EHRT 289.  They were there for a while, and then Nena and Petitioner left together.  EHRT 290.  When asked when she heard about the Womble murder, Wanda responded, "It could have been like the next day, day after, something like that."  EHRT 291.

Given Wanda's vague description that it was "dark outside" when Nena and Petitioner visited her, and her uncertainty about when this encounter occurred in relation to the murder, Wanda did not narrow the time frame of the Nena-Petitioner encounter sufficiently to establish that the visit took place at the time of, or even close in time to, the murder.

### iv.    Petitioner

Petitioner testified that, on the morning of July 1, 1986, he went to a flea market in San Jose with his younger brother, Eric Wright, and his friend, Denny McDonald.  EHRT 397.  Around 7:00 or 7:30 p.m., Petitioner returned to his motel room, showered and dressed, and went to Sedrick Henderson's house.  EHRT 398.  Sedrick and Petitioner went to Nena's house, after which Nena and Petitioner dropped Sedrick back off at his house and then went to Wanda Smith's motel room. EHRT 401.  Petitioner estimated they spent about 40 minutes in Wanda's motel room before returning to Nena's home, where they spent another 40 minutes talking outside.  EHRT 404-05. Petitioner arrived back at his mother's house around 11:00 p.m.  EHRT 425.  Once there, Petitioner called his cousin Zina Sims, who informed him that Duchine had "shot some woman in the head." EHRT 406.  Duchine and Tim showed up at the house and Petitioner handed the phone to Duchine. After Duchine got off the phone, Tim and Duchine left the house.  EHRT 408.

Petitioner's deposition in 2018 was the first time he had ever given a sworn statement about the Womble murders.

Petitioner never told his trial counsel that he was with Nena Johnson on the night of the

Womble murder.  EHRT 446, 452.  Petitioner's first trial counsel was Charles Hoehn.  EHRT 414.

Hoehn represented him for two or three months, but they "didn't really click" because Petitioner did

not want to waive his right to a speedy trial.  Petitioner never told Hoehn about his alibi because he

was "taking [Hoehn's] lead," and waiting for him to tell Petitioner what to do.  EHRT 447.  In

October 1986, Petitioner asked the trial court to relieve Hoehn as his attorney for ineffective

assistance of counsel, but never mentioned to the court that Hoehn had failed to inquire about or

investigate his alibi.  EHRT 449.

Hoehn was replaced by attorney Thomas Shelby, to whom Petitioner also failed to disclose

his purported alibi.  EHRT 451.  Shelby advised Petitioner that the government's case was weak, it

was the prosecution's burden to prove his guilt, and he was not going to put Petitioner on the stand

because of his criminal background.  EHRT 454.  At an *in camera* hearing regarding a dispute

between Shelby and Petitioner about whether Petitioner would waive his speedy trial rights,

Petitioner did not raise the issue of his alibi.  EHRT 455-56.

Before the penalty phase, the trial court held another *in camera* hearing where Petitioner

complained that Shelby had not consulted with him about calling several witnesses but made no

mention of anything related to his alibi.  EHRT 461.  At another *in camera* hearing held after the

penalty verdict, Petitioner told the trial court he wanted Shelby relieved as counsel for ineffective

assistance.  Once again, Petitioner did not raise the issue of his alibi.  EHRT 462.

Petitioner denied giving a different alibi to his trial attorneys than the one presented at the

hearing, although he agreed that he "probably" told Shelby that he went shopping in San Francisco

on July 1 (as opposed to a flea market in San Jose), but his memory of the day and night of the crime

is "fuzzy" in his mind.  EHRT 473-74.

Petitioner acknowledged that he has written some articles for publication on the internet, and

in one of the articles, mentioned that he was framed for the Womble murder, but never referenced

the alibi.  EHRT 465.  He also agreed that, while he did make an actual innocence claim in his state

habeas petition, the alibi was not raised.  EHRT 467.

United States District Court
Northern District of California

###### v.   Analysis

Petitioner's version of events is the only one that conclusively establishes an alibi for the time of the murder by putting him with Nena Johnson and then Sedrick Henderson until around 11:00 p.m. that night. Nena's and Wanda's statements are vague as to the date and time of the events, and Sedrick's testimony, while more detailed, is inconsistent with Petitioner's in material aspects, with Petitioner departing Sedrick's home around 7:30 p.m. Thus, Petitioner's own alibi testimony stands alone, without persuasive corroboration.

Petitioner's alibi testimony was presented to a court for the very first time three decades after the murder. Petitioner's apparent failure to disclose this alibi to his trial counsel, or to anyone prior to the lead up to this actual innocence litigation, is the most glaring factor undermining his credibility. Petitioner insists his trial attorneys ignored him, alienated him, and did not perform their duties conscientiously, such that he never had the opportunity or felt comfortable to disclose his alibi to them. This assertion is belied both by circumstantial evidence of Petitioner's behavior and character during the proceedings, and the attorneys' notes and files, which demonstrate, if nothing else, substantial efforts to interview Petitioner, and locate and interview helpful witnesses and evidence, including alibi evidence. *See* Respondent's Evidentiary Hearing Exs. 101-26. Petitioner was not new to the criminal justice system, as Respondent points out, having been tried and convicted for a homicide several years before the Womble trial. He was also not shy about voicing his dissatisfaction with his attorneys, as demonstrated by the multiple *in camera* hearings he initiated. Faulting Petitioner's attorneys for his failure to disclose any information about his alibi is simply not an adequate explanation at this late date, given the duration of the trial proceedings, the number of meetings, interviews, and court appearances Petitioner had with his attorneys, and the investigative efforts made by his defense team.

It is true, as Petitioner contends, that evidence of his guilt at trial was relatively weak. There was no physical evidence and no confession. However, this argument is less significant given the procedural posture of Petitioner's claim. *See Herrera*, 506 U.S. at 399-400. A jury found Petitioner guilty of murder beyond a reasonable doubt. To overcome the law's presumption of his guilt, Petitioner must meet the "extraordinarily high" burden of establishing his innocence. *Id.* at 417.

Although the Supreme Court has not explained exactly what that showing requires, it rejected actual innocence claims in *Herrera* and *House*.  *See Herrera*, 506 U.S. at 417-18; *House*, 547 U.S. at 555. The Ninth Circuit provided additional guidance in *Carriger*, where it rejected a free-standing actual innocence claim.  *Carriger*, 132 F.3d at 477.  A review of the stronger, but still inadequate, evidentiary showing in *Carriger* elucidates the deficiency of Petitioner's showing here.

Carriger was convicted of robbing a jewelry store and killing the proprietor.  *Id*. at 466. Almost all of the evidence against him at trial was provided by Carriger's acquaintance, Dunbar, in exchange for Dunbar's immunity in an unrelated burglary.  *Id.*  The state presented only two pieces of physical evidence that were not provided by Dunbar: a key to one of the cases of stolen jewelry, found in Carriger's wallet; and a single fingerprint of Carriger's on adhesive tape used to bind the wrists of the victim—the same type of tape Carriger kept in his first-aid kit in his van.  *Id.* at 470.

During post-conviction proceedings, Carriger made a persuasive showing that Dunbar was able to provide the police with all the incriminating information and evidence against him because Dunbar was the actual perpetrator.  *Id.*  It was also revealed that Dunbar had an extensive criminal history of similar violence and crimes, and was a known liar.  *Id.*  Most compelling, at an evidentiary hearing, Dunbar himself provided a detailed confession, under oath, that he had committed the robbery and murder and had blamed Carriger to evade punishment.  *Id*. at 471.  The testimony included details about the layout of the crime scene, the location and positioning of the body, and the method of killing.  *Id.*  Dunbar had also sent a four-page letter to a woman he corresponded with through a prison ministry program, confessing to the crime in detail.  *Id.*  Dunbar's wife testified that the day after the robbery she observed that the pants Dunbar had worn the previous day were stained with blood.  *Id.*  She also testified that Dunbar had confessed the crime to her, and several other witnesses testified that Dunbar had bragged to them about setting Carriger up.  *Id.*

Three weeks after giving his sworn confession, Dunbar sent a letter to the judge recanting. He was recalled to the witness stand and affirmed his recantation.  *Id.* at 472.  Dunbar claimed he had such accurate, detailed knowledge of the crime because Carriger's lawyer had shown him diagrams of the store and transcripts of Carriger's trial.  *Id.*  However, testimony from Carriger and Dunbar's lawyers established no such diagrams or transcripts had been shown.  *Id.*  Shortly before

United States District Court
Northern District of California

his death in 1991, Dunbar again confessed to the murder to his cellmate. *Id.* at 473.

In reviewing the evidence, the Ninth Circuit pointed out that much of the physical evidence at trial supported Dunbar's guilt: all of the stolen jewelry was in Dunbar's possession and the stolen jewelry inside the attaché case only had Dunbar's fingerprints on it. *Id.* at 474-75. Furthermore, no other adequate explanation had ever been provided for Dunbar's detailed knowledge of the crime. *Id.* at 475. Even so, the court concluded Carriger had not met his burden under *Herrera* of "affirmatively proving" his innocence.

> Although the postconviction evidence he presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove Carriger's innocence: Carriger has presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor is there any new and reliable physical evidence, such as DNA, that would preclude any possibility of Carriger's guilt. Although Dunbar's confession exonerating Carriger does constitute some evidence tending affirmatively to show Carriger's innocence, we cannot completely ignore the contradictions in Dunbar's stories and his history of lying. Accordingly, the confession by itself falls short of affirmatively proving that Carriger more likely than not is innocent.

*Id.* at 477.[4]

Here, Petitioner's evidence is far less compelling than that presented by the petitioner in *Carriger*. Petitioner has not, by any measure, proved that his brother Tim committed the murder of Willie Womble. Even if Tim was involved in some way, that would not "preclude any possibility of [Petitioner's] guilt." *Id.* As for Petitioner's alleged alibi, the only conclusive evidence that Petitioner was elsewhere at the time of the murder is *his own testimony*, given for the first time in 2018. The other witness testimony from the 2018 hearing corroborates the basic fact of Petitioner's visit with Nena Johnson, but crucially, not the time-frame. Further, when considering the weight of Petitioner's own testimony, the Court cannot ignore the fact that he failed to raise the issue of his alibi for decades after the Womble murder. For the reasons discussed above, Petitioner's showing

---

[4] In *Carriger,* the same evidence found wanting to establish a free-standing actual innocence claim was sufficient to warrant passage through the *Schlup* "miscarriage-of-justice" gateway, when combined with Carriger's substantial constitutional claims under *Brady* and *Giglio. Carriger,* 132 F.3d at 478. The divided *en banc* court accordingly ordered a new trial. *Id.* at 482.

of innocence "falls short of affirmatively proving that [he] more likely than not is innocent."  *Id.*

Petitioner has therefore failed to meet the "extraordinarily high" threshold required to succeed on

an actual innocence claim.  *Herrera*, 506 U.S. at 418-19.


**B.**     **Claim H – Ineffective Assistance of Counsel Subclaim**

In a subclaim of claim H, Petitioner alleges that his trial counsel, Shelby, provided

ineffective assistance by failing to conduct a reasonable investigation of Petitioner's guilt or

innocence.  He claims that such an investigation would have disclosed that Petitioner's brother, Tim,

committed the crime with which petitioner was charged.  Petitioner further contends that Shelby

knew that Tim's shotgun was used to kill Willie Womble, and that the same shotgun was used in a

shootout with Kenny Moore shortly before Willie Womble's murder.  Shelby allegedly did not

investigate any avenues of defense relating to the shotgun, and instead moved to exclude any

shotgun evidence from trial.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must

establish two components.  First, he must establish that counsel's performance was deficient, i.e.,

that it fell below an "objective standard of reasonableness" under prevailing professional norms.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was

prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at

694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.*

A court need not determine whether counsel's performance was deficient before examining

the prejudice suffered by the defendant as the result of the alleged deficiencies.  *Id*. at 697; *Williams*

*v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (approving district court's refusal to consider

whether counsel's conduct was deficient after determining that petitioner could not establish

prejudice), *cert. denied*, 516 U.S. 1124 (1996).

Petitioner submits four exhibits in support of his claim. As discussed below, Petitioner's new

1    exhibits and related arguments do not advance his claim because they fail to establish that he was

2    prejudiced by the alleged deficiencies of trial counsel's performance.

3         Petitioner's first exhibit is a report from investigator David Freedman, dated October 21,

4    1999, regarding his interview of Joe Gotz, Shelby's trial investigator.  ECF No. 531, Ex. A.

5    According to the report, Gotz investigated only what Shelby specifically asked him to do.

6    Furthermore, when Freedman asked Gotz, who was a former police officer, whether the Richmond

7    Police was racist, Gotz responded: "Yes, they had to be, it was a matter of survival."  *Id.*

8         The point of Freedman's report appears to be an attempt to show that Gotz and Shelby did

9    not investigate Tim.  The record, however, demonstrates that Tim refused to talk to Petitioner's first

10   investigator, Stanley Hallmark, *see* EHRT Ex. 110 at 3215, and Hallmark's attempt to investigate

11   Tim was "shut down" by Petitioner's mother and family.  ECF No. 531, Ex. C.  Petitioner himself

12   was decidedly uncooperative with counsel and their investigators.  Freedman's report fails to

13   identify leads that Gotz and Shelby could have, but did not, pursue.

14        Petitioner's second exhibit is a declaration from Michael Wayne Davis, who testified at

15   Petitioner's evidentiary hearing in state court in 1996.  ECF No. 531, Ex. B.  Davis avers that if

16   Petitioner's attorney had approached him during Petitioner's trial, he would have given the same

17   testimony as the testimony he provided at the state court evidentiary hearing – namely that Tim had

18   made admissions in relation to the Womble murder.  *Id.*; *In re Johnson*, 18 Cal. 4th 457.  At the

19   state court hearing however, Davis was deemed to lack credibility because he had been convicted

20   of crimes of moral turpitude.  *Id.*  It is doubtful that he would have been a credible witness at trial.

21   Moreover, at the time of petitioner's trial, Davis was incarcerated.  ECF No. 532, Ex. A.

22        Petitioner's third exhibit is a declaration from Stanley Hallmark, who was the investigator

23   for Petitioner's first trial counsel, Charles Hoehn.  ECF No. 531, Ex. C.  Hallmark states that at

24   some point, he started to suspect that Tim played a role in Womble's murder, but as he got closer to

25   examining Tim's culpability, he felt that Petitioner's family, particularly his mother, started to grow

26   distant and stopped cooperating with him.  *Id.*  Hallmark avers that had he not been removed from

27   Petitioner's case, he would have continued to investigate Tim and would have followed whatever

28   "leads" he was able to develop.  *Id.*

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

As Respondent points out, Hallmark's suspicions do not stand as evidence of Tim's role in the murder. To the extent that Hallmark avers that had he remained on the case, he would have pursued leads relating to Tim, such leads remain speculative – especially since Hallmark himself makes clear that Petitioner's family would have thwarted such work. *Id*.

Finally, Petitioner's fourth exhibit is a declaration from Kevin Morley, Petitioner's current counsel's paralegal. ECF No. 531, Ex. D. Morley states that he reviewed trial counsel's records as well as those of his investigator, Gotz, and the records reveal that no "investigation was conducted into whether Tim Johnson murdered Willie Womble." *Id*. It is not clear exactly what documents Morley reviewed. In any event, Morley's declaration constitutes no more than the opinion of Petitioner's counsel's staff. Petitioner fails to support his allegation with direct evidence from sources such as Shelby and Gotz, who were alive and available for many years following the crime.

In sum, the exhibits submitted in support of claim I do not lend significant support to Petitioner's allegations. They are also belatedly submitted twenty-one years after his initiation of proceeding in federal court.

Petitioner's argument that trial counsel was ineffective for failing to raise a defense relating to the gun used in Willie Womble's murder is also unavailing. The fact that the gun used in Womble's murder was previously used by Tim is a double-edged sword. Although Petitioner contends that it suggests that Tim was the perpetrator, it also links Petitioner to the crime because it shows that Petitioner had access to a gun through his brother. In the absence of concrete evidence that Tim, and not Petitioner, was the shooter, Shelby reasonably moved to exclude the gun from evidence.

Having reviewed petitioner's arguments and evidence, the Court concludes that Petitioner fails to establish a reasonable probability that, but for counsel's allegedly deficient performance, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694. Accordingly, the ineffective assistance of counsel subclaim of claim H is denied.

**CONCLUSION**

For the reasons discussed above, claim I and the ineffective assistance of counsel subclaim of claim H are denied.


**IT IS SO ORDERED.**

Dated: September 29, 2020

**SUSAN ILLSTON**
**United States District Judge**